MARY PHELPS & JOHN S. PHELPS *vs.* THE STEAMSHIP CITY OF PANAMA.

Admiralty jurisdiction is vested in the District court of Washington Territory.

The word "law" defined.

The phrase "laws of the United States" as employed in the Organic Act conferring jurisdiction upon the District courts, does not relate simply to statute law, but embraces all other rules of property and conduct in which the Supreme power exhibits, and according to which it exerts its governmental force; and by the phrase "laws of the Territory" occurring in the same grant of jurisdiction, is meant not alone the regulations and customs having the force of law in this Territory, but the laws which the Territory of Washington, considered as a political power, subordinate to the general government, has authority to administer as emanating from itself.

Only those are to be regarded laws of the United States, which have the force of law, within the area of our Territory, either by virtue of provisions of the federal constitution, or direct federal enactment, or by promulgation of an authorized constitutional branch of the general government. All others are Territorial laws.

The line of separation between state and national power, furnishes a reliable analogy between that of the nation and Washington Territory.

Before the adoption of the federal constitution, admiralty and maritime law were necessarily local and territorial, but within the states of the union by the adoption of the constitution such law, and with it, its procedure, became a part of the laws of the United States.

Law maritime and admiralty was in this Territory as a part of the law of the locality, when our Territorial government was erected, and was to be classed among the "laws of the Territory," as the same existed throughout the States of the Union, to be administered in the federal courts, and classed among "the laws of the United States."

By the act of Congress creating the Territorial government, the federal laws not inapplicable (R. S., Section 1891,) were extended over this Territory.

The law admiralty as a federal law not being inapplicable, thus displaced, or merged within itself, the same law existing here as part of the law of the locality.

The right and status of a married woman at common-law reviewed.

A woman has certain inalienable personal rights that are not relinquished by marriage. Among these would be the right to contract for the safe transportation of her own body, and the right to sue for damage resulting from a breach of such contract.

The objection that her husband joins her in such suit, cannot first be taken advantage of in this court.

The husband with the wife's consent might sue to recover in such an action.

The name of a libellant unnecessarily inserted in a libel at a proper stage of the case should, if motion be made therefor, be stricken out, otherwise it will not be noticed.

That a suit *in rem* in this case is proper, both principle and authorities con_.

cur; even if the action be deemed based on the *quasi* tort, upon principle and *perhaps* on the authorities, it would also be proper.

The circumstance that the subject of transportation is a person, instead of merchandise, should not alter the rule.

There was no right of trial by jury in this case.

A statement of the facts of the case.

To warrant a reversal of the finding of facts, by the judge in the lower court, there should be such a preponderance against the finding as would justify the granting of a new trial in a court of common-law.

The method of estimating the damage in this case set forth in the opinion.

Appeal from Third Judicial District holding terms at Port Townsend.

*B. F. Dennison* and *H. T. Bingham* for libellants.

*James McNaught* for respondents.

Opinion by GREENE, Associate Justice.

Mary Phelps and John S. Phelps, her husband, on the 7th day of July, 1876, filed their libel in the District court of the Third District, for this Territory, against the steamship, *City of Panama*, etc., in a cause of contract and damage, civil and maritime. The libel propounds, as constituting their cause of action: (1) That the relation of passenger and common carrier, for hire, subsisted between Mrs. Phelps and the owners of the steamship, pursuant to an undertaking by the owners, that they would safely transport her; and, (2) that the owners were guilty of such negligence as to amount to a breach of their undertaking, and immediately result in severe and permanent injuries to her person.

The Pacific Mail Steamship company, as owner and William B. Seabury, as master, appear, claim and defend the vessel.

A decree for the libellants, awarding five thousand dollars, damages, is rendered in the court below. For relief from that decree, both parties turn to this court. The libellants appeal, on the single ground, that the damages are too small. The respondents appeal, on various grounds, which may be enumerated as follows:

1.   The District court has no jurisdiction in admiralty.

2.   The procedure in this case has been, and is, according

to the course of courts of admiralty, whereas it should be according to the rules of pleading and practice prescribed by the Civil Practice Act of the Territory.

3. The libel pleads a cause of action, in nature *ex contractu*, and yet shows no good cause of action, upon contract, in the married woman, the libellant, Mary Phelps.

4. Mrs. Phelps and her husband are here improperly joined.

5. Recovery upon a contract such as is here propounded cannot be enforced *in rem.*

6. The claimants were and are entitled to a trial by jury.

7. The decree is based upon an erroneous finding of facts.

8. The libellants are not entitled in equity to relief upon the facts.

9. The assessment of damages is excessive.

Seldom has a case arisen, involving such various learning.

Seldom have counsel been gifted with such industry and success, to assist the court with every resource at command, which might conduce to a sound decision. The prayer so earnestly expressed by counsel finds utterance in the hearts of the judges, that the Author and Revealer of justice may guide this cause to that conclusion which, in His eyes, ought not to be set aside.

The controlling questions, before us for adjudication, appear to be these:

1. Is there vested in the District and Supreme courts of this Territory any admiralty jurisdiction? If there be, thus,

2. Under what rules is it to be exercised?

3. Does the libel in this case show a good cause of action, upon contract, or otherwise, in the libellant Mary Phelps, or in her and her husband together?

4. Are husband and wife here properly made co-libellants?

5. Can such a cause of action as this be enforced *in rem*?

6. Are parties in admiralty in this Territory entitled to trial by jury?

66

7. What, here, are the facts?

8. Are the libellants upon the facts entitled to recover?

9. What damages should, if any, be given?

The first inquiry is a startling because a novel one. For a quarter of a century the District and Supreme courts of this Territory, unsuspecting that they were impotent, have been exercising plenary powers in admiralty. Appeals have repeatedly been taken from their decisions, to the Supreme court of the United States. Upon such appeals maritime rights have been finally adjudicated; and the decrees of the Supreme court have been enforced in this court, conformably to mandates of that high tribunal recorded here.

If a doubt of jurisdiction were ever dreamed, it never flashed among the weapons of argument, nor clouded the light of a decree. But now, since we are confronted with the bold denial of the respondents, we come, judicially, to determine whether the supposed jurisdiction, so long acquiesced in, does in fact exist.

All our local courts derive their operative energy from one head, namely, the Territorial Organic Act or charter. That charter was the creative word which gave them being. By virtue of its provisions, as preserved and re-enacted in the revised statutes of the United States, they at present exist. Hitherto that organic act has been generally understood, by those interested, to study its language, not only to grant to the District courts, but to require of them the cognizance of admiralty and maritime causes.

It plainly vested "the judicial power of the Territory" in "a Supreme court, District courts, Probate courts and Justices of the Peace," and prescribed that the District courts should "have and exercise the same jurisdiction in all cases arising under the constitution and laws of the United States and laws of the Territory, as is vested in the Circuit and District courts of the United States." 10 Stat. at Large, 175, Section 9; R. S., Section 1911; 19 Stat. at Large, 62, Chap. 154.

Bench and bar have, without questioning, assumed that

cases of admiralty and maritime cognizance arise either under the laws of the United States or under the laws of the Territory. And upon this assumption, be it well grounded or otherwise, the Territorial District courts have uniformly and continuously exercised in such cases the same jurisdiction as is exercised in like cases by the District courts of the United States. Is such a practice error?

The error, if there be any, would seem to spring from attaching too broad a meaning to the phrases, "laws of the United States" and "laws of the Territory."

That is the argument of the respondents. They assert that the word "laws" in those phrases is to be taken as exactly synonymous with statutes or written enactments. We hold that such is not the meaning of the word. The term "laws" includes not only written expressions of the governing will, but also all other rules of property and conduct, in which the Supreme power exhibits, and according to which it exerts its governmental force.

Mr. Justice Story, in *Swift vs. Tyson*, (16 Peters, 118,) defines the "laws of a State" to be "the rules and enactments promulgated by the legislative authority thereof, or long established local customs having the force of laws."

The laws of a commonwealth, in the language of Bouvier, are those rules and principles of conduct which the governing power in a community recognize as the rules and principles which it will enforce or sanction, and according to which it will regulate, limit or protect the conduct of its members." Tit. Law, Bouvier Dictionary.

The Supreme court of the United States, in the case of *The American Insurance Company vs. Canter*, (1 Peters, 511) expressly construe the phrase "laws of the Territory" occurring in the judiciary section of the Organic Act of Florida Territory, to include not only rules enacted by territorial legislation but also that pre-existing body of admiralty and maritime law, which, without reference to statutory enactment, has flowed in upon and over the peninsula of Florida with the tide of Spanish immigration.

The same extended interpretation of this word "laws" as found in the identical expression "laws of the Territory" in the very part of our own Organic Act now under consideration was clearly and unanimously announced by this court upon the motion to suppress depositions in *Griffin vs. Nickels* at the December term, 1872. Our opinion of the word is unchanged.

But the significance of the two phrases, "laws of the United States" and "laws of the Territory," is not defined, until the names, "United States" and "Territory," receive definition. This definition must suit the context. It must accord, both with neighboring words, and with the general tenor of the whole act. If either name were used alone, it might have a meaning, which, when it is used co-ordinately with the other, as here, is not attributable to it. The act has continuous reference to a creating power—the United States, and to a created power—the Territory of Washington, as distinct one from the other. And these two powers, in the two adjoining phrases, "laws of the United States" and "laws of the Territory," appear to be spoken of as complementary, the one to the other.

We perceive, then, that these names here express, not mere areas, but organized political bodies. By "laws of the United States," therefore, are not to be understood the multitude of rules of political conduct which exist, some here, some there, some everywhere, within the geographical boundaries of the United States, but rather those rules, whether local or extensive, which emanate from, or are adopted by, the political power, named the United States, and which that power exists in order to administer. And, by the "laws of the Territory" are meant, not all regulations and customs, some inferior, some superior, having the force of law, within the region defined in the Organic Act, but the laws which the Territory of Washington considered as a political power, subordinate to the general government, has authority to administer, as if emanating from itself. Whether any given laws, administrable within the territorial area, are to be accounted, there, as the laws of the one power or the other, is to be decided by determining whether,

they fall within the peculiar province of the one or the other to administer.

And here, to avoid confusion, a distinction must be observed between the compass of administration confided to the Territory and a certain additional range of function entrusted to some of the officers specified in its charter. Some of these officers, as, for example, the attorney and the marshal, are merely agents of the general government, and in no sense officers of the territory, and have nothing to do with the administration of territorial laws. Others of them, as the governor, the secretary and the supreme justices, perform functions, both under the general and under the territorial government. When the governor respites for United States offenses, or the secretary remits to congress the laws and journals of the assembly, or the judges sit to determine cases arising under the laws of the United States, these officers are not acting under sanction of, nor as accountable to, any territorial authority, but as resident functionaries of the United States. Thus is pointed out the existence of a dividing line between the United States as a political power, and the Territory as a like political power each having its own body of laws and its own agents to administer them. The fact that some of the ministers of the inferior government are appointed, compensated and held responsible by the superior, and owe to that government independent duties, serves to illustrate the mutual relations of the two powers, but does not prevent the line of demarkation between them.

That a line of division exists is obvious. But where is it to be drawn? The entire scope of administration, local and general, petty and national, devolves primarily upon the United States.

How much have they set off for territorial exercise? We conceive that the dividing line between the state and national governments, furnishes a safe, and the true analogy for us. We draw, then, the line thus:

1. Those laws, and those only, are to be taken to be the laws of the United States, which extend to and have the force of law within the territorial area, either by virtue of provisions

of the constitution of the United States, or by virtue of direct enactment or promulgation, by a constitutional branch of the general government, having authority so to act in the premises, and,

2. All other laws prevalent within the territorial area, are to be taken to be laws of the Territory.

This distribution seems to have formed the ground-work of that portion of the opinion, in *The American Insurance Company vs. Canter*, which discriminates between laws of the United States and laws of the territory of Florida. Both the fact and the position of the line of division being thus ascertained, it becomes possible, perhaps, to determine whether on either, and if on either, on which side of the line, the law, admiralty and maritime, falls.

Proceeding to do this, we perceive very easily, that, within the states of the Union, all admiralty and maritime law would lie on the United States side of the line, that is, within the denomination of laws of the United States, for there, courts exist which are created under the constitution, and to which, by the constitution, is given cognizance of "all cases of admiralty and maritime jurisdiction." Const,. Art. 3, Section 2.

This constitutional investiture makes the law of the cases the law of the courts. And the law of the courts becomes the law of the United States, throughout the extent of the states, simply because it must be exclusively administered by those courts, as courts of the United States.

Accordingly in *Hornbuckle vs. Tombs*, (18 Wall, 648), cases in admiralty are enumerated, with others, as cases that arise under United States laws, and in *The Lottawana* (21 Wall, 558, 573, 574) the maritime law is affirmed to be a law of the nation. The admiralty and maritime law, however, it is to be noted, is not a law originating from, but adopted by, or descended upon, the United States.

In the colonies and territories, it was originally colonial and territorial law. The general government succeeded to it within the states, upon its assumption of judicial authority, under the constitution.

This assumption of judicial authority included, of course, an assumption within the jurisdiction of its constitutional judges, of all existing law, which those judges were exclusively to administer; but it would not seem to have included the assumption within the territories, present or prospective, for administration by the general, as distinguished from the local, government, of any law prevalent there, since, for the administration of such law, there, the constitution provided no judges and ordained no exclusive jurisdiction.

So, as regards the territory of Florida, it was held, in *The American Insurance Company vs. Canter*, that the law, admiralty and maritime, was existent in that territory, for administration by the courts, not as among the laws of the United States, but as among the laws of the territory.

Let us see, whether the same law existed, here, at the creation of our territorial government, so as, in the absence of any national legislation to the contrary, it would properly have devolved upon the territory to administer. This is an important question in this case, for we understand the respondents to deny that such law ever has existed, or does now exist, here.

When this territory was created, it found rights here, and a law under which to enforce them; it found wrongs, and a law by which to redress them; it found changes needed, and a law according to which to effect the changes; and it proceeded to do those things for which it was sent. It did not come to begin an era of law, nor an era of new law, but simply to begin administering and announcing laws, where a previous administration had left off. It came, as if a local sovereignty, and took up the administration of all laws, of whatever origin, operating within its locality, except the paramount ones, which, as pertaining to the peculiar functions of national sovereignty, the United States might have reserved. Now, when it came, did it find here a region where was no admiralty nor maritime law? Not even a savage *Droit de bris?* Did it find no navigable waters, no navigated ocean, no harbors and no rocks? no possibility of wreck, and no liability to salvage? Did it find no shipping in the Columbia, nor on the Sound? Did it find no mariners and no merchants? or have none come here since?

We know the history of this region. There were men here. Where man is, there is law. There were men here along bays and harbors, and navigable streams, men of our own civilization, and having rights and claims and ventures, dependent upon the relations of themselves and their lands, to such waters.

There were the people of the United States, in a national capacity, owning both those waters and the territory adjoining. These men and this people were commercial and maritime. There were deep sea-ships, both foreign and domestic, arriving and departing. There were nearly three thousand miles of tide-washed shore. There was an indented coast line, through three degrees of latitude, breasting an ocean traversed by the marine craft of every maritime people under heaven. To say that this region was such, so situated, so peopled, so owned, so related, is equivalent to saying that both a local law, admiralty, and the general law, maritime—that law of all the world— existed, as living laws, upon it. Its inlets, harbors, and tidal rivers became, as soon as their shores were possessed by a civilized community, the adopted and permanent resting places of admiralty law; while the law, maritime, from every farther shore, blew in with the gales that brought the ships.

Law, admiralty and maritime, then, was here as part and parcel of the laws of the locality, when a Territorial common-wealth was first enacted. It devolved, therefore, upon the local commonwealth to administer, unless the parent national com-monwealth otherwise provided.

Let us be clear. At the date of the election of the Terri-torial government, admiralty and maritime law existed here as a law of the locality, and was, therefore, as such, to be classed among "laws of the Territory."

Simultaneously, the like law existed within the states as a law to be administered exclusively by the courts of the United States, and therefore to be classed among "laws of the United States.

Does this position of things at present obtain?

But two answers can be made which will sustain the juris-diction of our courts.

1. That it does, so that admiralty and maritime law remains a law of the Territory, and a case arising under it properly arises under the laws of the Territory. And,

2. That it does not, but that the admiralty and maritime law is now operative within the Territory as a law of the United States, and a case arising under it arises under the laws of the United States.

The second answer we hold to be the correct one.

The laws of the United States, so far as not locally applicable, have been extended over this Territory (R. S., Section 1891.) It is not necessary to enquire when first this was done. The fact is they have been so extended. Admiralty and maritime law was among the laws of the United States, and was not locally inapplicable within this Territory. Its extension to the Territory as a law of the United States, put an end to its continuance as a law of the Territory.

The law of the Territory became overrun, over-shadowed, merged.

All cases here, therefore, which now arise under admiralty, or maritime law, are correctly to be styled cases arising under the laws of the United States. Of all such cases, the Territorial, District and Supreme courts have undoubted jurisdiction.

We come, now, to the second inquiry above proposed, namely:

What rules are to govern the exercise of admiralty and maritime jurisdiction by our courts? This, it seems to us, is very readily and unmistakably answered if we consider,

1. The nature of the jurisdiction to be exercised; and,

2. The relation which that jurisdiction is intended to bear to that exercised by the District and Circuit courts in the states.

First, the jurisdiction is of a nature partly national, partly international. So far as it relates to admiralty law proper, it is national; so far as it relates to the larger maritime law, reaching beyond seas, and meeting round the globe, it is international.

67

But whether international or simply national, uniformity, not only of rules of decision, but of rules of procedure throughout the jurisdiction of the United States, in states and in territories, is obviously, in every aspect, exceedingly to be desired. And, were there no other consideration to guide our practice, this court would proceed as all the courts of this Territory hitherto have proceeded, as nearly as possible in all respects, according to the rules in admiralty, promulgated by the Supreme court of the United States. The rules have the force of law throughout the states; they are, indeed, laws of the United States, and we readily have followed them, within this Territory, so far as they could be applied in our courts.

Second, the jurisdiction of the District courts is intended by congress to be "the same" as that exercised by the Circuit and District courts in the states. Such is the express statement of the Organic Act. R. S., Section 1911, 10 Stat., 175, Section 9.

The jurisdiction being "the same" the rules in admiralty, which are as we have seen, laws of the United States, have no local inapplicability. They are, therefore, to be deemed extended to this Territory by virtue of Section 1891 of the revised statutes.

Our answer to the second inquiry, then, is, that the rules in admiralty, promulgated by the Supreme court of the United States as far as they can be applied, are to regulate the procedure in cases of admiralty and maritime jurisdiction in the courts of this Territory.

The third question for decision is, whether the libel shows a good cause of action upon contract or otherwise, in the libellant, Mary Phelps, or in her and her husband together.

On inspection of the libel, we find it fails to state, singly and without ambiguity, the nature of the cause of action. It does not, under the 23rd admiralty rule, declare, whether this is a cause "of contract, or tort or damage," but states doubly that it is a cause of "contract and damage."

Regarded as a case, in which Mrs. Phelps is the aggrieved

party, it could not, technically, within the rule, be called a cause of "damage," though it might be one of "tort," for the word "damage" describes a wrong to property, and not a wrong to the person. 1 Browne's Civil and Adm. L., 1st Am. Ed., 401.

Perhaps, in this libel, the word ought not to be read technically.

We incline to think it ought not. To its addition, in any aspect, the defendants have made no exception. We take the libel, therefore, according to common law phrase, to sound both in contract and in tort. We do not think the 23rd rule is opposed to the uniting, in the same pleading, torts and contracts, arising out of one transaction, and casting a liability in favor of the same persons, upon the same persons or things.

Admiralty practice is equity practice, and resists the multiplication of suits. In the case of *The Zenobia* (1 Abb. Adm. R., 48) the libel was "filed for a double cause of action, on the shipping contract, and for its tortious violation," and, upon exception taken, the court refused to compel the libellant to elect which branch of his remedy he would pursue. (See form of libel, 1 Abb. Adm. R., 80.) In the case before us, however, the libellants have elected to rest their arguments, as to their right to proceed against the vessel, upon the point that there was a contract between Mrs. Phelps and the owners, rather than, in any part, upon the view that there was, in this case, as against Mrs. Phelps, a maritime tort also. The libel propounds certain transactions, which clearly show a cause of *quasi* tort, civil and maritime, but it also, in the same transactions, discloses a cause of contract, provided Mrs. Phelps, being a married woman, had any capacity to contract, which will avail her husband and herself in this court. Libellants claim that there was a contract which was executed on her part, and which, being executed, will, on the application of herself and husband, be enforced against the vessel in this forum.

The long and often agitated and very unsettled question, whether the law of domicile of place, of contract or of forum, shall prevail, is here re-opened.

We lack, at the very least the facilities to determine that question satisfactorily, if, indeed, such a determination be possible at this day. We do not think its determination necessary here.

The wife's domicile is admitted to be the state of Missouri, but it is said by libellants that the maritime law is recognized in Missouri, and should be deemed the *lex domicile* in this maritime cause. Whether the law of Oregon or of Washington, or the maritime law of the United States should be considered the *lex loci* is debated, though it is agreed that one or the other should be. The *lex fori* is manifestly the maritime law.

There is no doubt that by the law maritime—call it here *lex domicilie*, *lex loci*, or *lex fori*, as one will—if that is to be regarded as the governing law, Mrs. Phelps had capacity to make the contract in dispute, whether it be contract or *quasi* contract. *The Steamboat State of New York*, 7 Ben., 450; Betts Adm. Pr., (Int.) 6, 7; *Jennings vs. Carsons, Ex'rs.*, 1 Pet. Adm., Dec. 4, n.; 1 Browne's Civil and Adm. L., 83; Pothier Pt., 1, ch. 1, Sections 1, 2, ¶ 115.

We do not understand the law of either Washington, Missouri or Oregon to have varied from the common law relating to the powers of married women, except to enlarge them. The general rule of the common law is, that a woman cannot, during coverture, make a lawful contract.

Her ability to contract is considered merged, upon marriage, in that of her husband, so that neither she nor he can be sued on contracts made during marriage by her, without they were assented to by him.

But this rule has exceptions. And the exceptions appear to arise in this way: Though the woman's relations to her husband and society are changed by marriage, so that her interests become, in theory, at least, for the most part, identified with her husband's yet she retains, in the eyes of the law, a personalty of her own. She does not, in marrying, barter her very self away. She does not go into utter slavery. She is still recognized as having a personal interest of her own, both

in her skilled faculties and in her body, her reputation and her health. She has, as distinct from her husband, the rights of "life, liberty and the pursuit of happiness," rights inalienable even by nuptial bargain. The common law has been always disposed to protect the married woman, as an individual, in the enjoyment of such inherent rights. It showed this disposition by criminal process, by civil actions on the case, by the writ of *habeas corpus*, and also, as we shall see, by actions upon her executed contracts, express or implied. It failed, indeed, under the rulings of male judges, affecting their own sex, to protect her always or perfectly. It declined to allow her to bring a suit in which her husband would not join, and did not secure to her as against him the fruits of her suit. It seemed, in civil cases, conclusively to presume every husband to be truly devoted, body, soul, spirit and estate, to cherish his own wife as his own flesh. This, if it were a chivalrous presumption, was made law by presumptuous chivalry; for it sheltered behind its shield the very oppression it thought safe to ignore.

In her husband, the wife was supposed to find her knightly and self-sacrificing protector. The law esteemed her well defended, though, alone, she could bring no action, during her husband's life, and though she might never know whether a suit, wherein he joined with her, went well or ill. If she was damaged by the wrongful act of a third party, two actions lay, one by the husband alone, for his losses, *per quod consortium amisit,* and for expenses of cure, etc., another by herself and husband for what she personally had suffered. If for some consideration, which was to move to herself, individually, she made a contract and executed it on her part, she could, by joining with her husband, sue to compel the fulfillment, by the other party or to recover damages for the breach. (1 Story on Cont., Section 92 and cases cited; Chitty on Cont., 148 a; *Ham vs. Boody,* 20 N. H., 411.) In such a case she was called "the meritorious cause of action."

The meritorious cause of action would Mrs. Phelps be, in common law, in a case circumstanced like the present. For, whether we consider the contract propounded in the libel an

express one, executed on the part of Mrs. Phelps, by payment of fare at Portland, and subsequent embarkation at Seattle, or an implied or *quasi* one, executed to a certain extent on her part, by her merely going aboard as a passenger, she being received and welcomed as such by the agents in charge of the vessel, the contract related to the safe carriage and delivery of her own body; in order that it might be fulfilled she committed her own body to the custody of the owners of the steamship; and a breach of it was liable to, and did affect her, as an individual, in a way that the common law would recognize as entitling to redress, and yet in a respect in which it would recognize no right of redress as belonging to her husband, personally. Deemed, under that law, as the "cause of action," she would be allowed, with her husband, to sue upon it, though made by herself alone. *Fuller vs. Naugatuck R. R. Co.*, 21 Conn., 557, 13 U. S. Dig., 396.

In any view of this particular contract, then, with reference to the wife's power to make it, it must be regarded as a good cause of action here.

But can both husband and wife join in suit upon it? This is our fourth inquiry.

At this stage of this case we will not interpose to prevent their doing so, although we think that the wife might, in this civil forum, have sued alone. *The Steam Boat The State of New York*, 7 Ben., 450.

In practice, however, the husband, with the assent of the wife, has been allowed to sue separately, and in his own name to collect her claim. *The Tillie*, 13 Blatchf., 514.

But admit that the husband is improperly joined, his joinder does no substantial harm.

A few supernumerary words in the libel cannot prejudice the real rights of the defense. If his name had no bearing upon the case, it might have been stricken out on motion. Or, if allowed to stand, equity would have looked at the pleading and failed to see it here. It is too late for the defendants to take any advantage of such a misjoinder, at this hearing upon the merits.

We next, and fifthly inquire, whether this cause of action is good ground for a suit *in rem.*

If this libel were to be considered based upon the *quasi* tort, there might exist some difference of opinion as to whether the ship herself were bound to answer, though principle would seem to conclude that she is.

The passenger stands where the cargo does; he is aboard to be safely carried. For malice or negligence damaging cargo, the ship would respond. *The Waldo*, Daveis, 161, 163; *The Brig Casco*, Ib., 184, 186; Fland. on Mar. L., Section 204.

So also she might in the case of her passenger, wrongfully injured.

The 16th rule, which expressly requires suits for assault and battery to be *in personam*, should, it would seem, be confined to cases of assault and beating, and not even reach the case of a passenger or seaman assaulted, when claiming the cover of the contract, proper or improper, under which he has a right to safe carriage. Ben. Adm. Pr., Section 309.

But principle and authorities concur, as to the answer to be given this fifth question, viewing the cause of action as a cause of contract. The true doctrine is laid down by that eminent admiralty jurist, Judge Betts, in the case of *The Aberfoyle*, as follows: "Ships carrying passengers for hire stand on the same footing of responsibility * * * with those carrying merchandise or freight—passage money and freight being, in legal acceptation, equivalents. The liability of the vessel in specie, upon a contract of affreightment, is not varied by the circumstance that the contemplated subjects of transportation are passengers instead of merchandise. A passage contract is in respect to the vessel's liability, only a species of affreightment, in which the passengers constitute the cargo, and the passage money answers to the freight," (Abb. Adm. R., 242, 256; 1 Blatchf. C. C. R., 360, 361.) To this all text writers and judges agree. Flanders on Ship., Section 445; Benedict Adm., Section 286; *The Pacific*, 1 Blatchf. C. C. R., 569; *Koch vs. Oriflamme*, 3 Sawy., 497; *The Canadian*, 1 Bro. Adm., 11; *The Moses Taylor*, 4 Wall., 411.

The law is established that, in such a case, prosecuted upon the contract, the passengers may proceed *in rem.* And we fail to see any difference between a case of tort and a case of contract, in this regard.

The sixth question to be decided may be very summarily dismissed. This is a case, in the absence of any controlling legislation to the contrary, to be tried according to the procedure of the civil law and the United States admiralty rules. Trial by jury is unknown to the civil law. It is not adopted by statute nor by the rules.

The sixth and seventh amendments to the constitution are relied on by respondents to oppose this. These amendments are, unquestionably, under an extenditory statute, or otherwise, in force in this territory, but in reference to them it will be seen that the former relates only to "criminal prosecution," and the latter to suits at "common law."

The constitution recognizes, in the language it employs, a triple distribution of jurisdiction into law, equity and admiralty. Const., Art. 3, Section 2.

A suit in one of these jurisdictions is not a suit in another.

A suit in equity or admiralty is not a suit at "common law." *McCord vs. Steamboat Tiber,* 6 Bis., 409, 411.

Neither in the court below nor in in this court, could this cause be tried by a jury. Ben. Adm. Pr., Sections 193, 203.

Seventhly we find the facts to be these :

Mary Phelps, one of the libellants, was, at the time in the libel and hereafter referred to, a married woman of stout figure, and weighed about two hundred pounds. She was about sixty-three years of age and had a slight infirmity of sight, so as to find it convenient, for some purposes, to use eye-glasses. Up to the time of the accident hereafter mentioned, she had, as a rule, enjoyed exceptionably good health, and was then as well as usual. Prior to that time, she was right handed, her right arm was sound and she had a perfect use of it. Her residence was, and is, in the state of Missouri, with the other libellant, who is her husband. The *City of Panama* was, during the same

time, an ocean steamship, of ——— tons burden, owned by the respondent, the Pacific Mail Steamship Company, a corporation duly incorporated, and was commanded by William B. Seabury, her master.

The vessel was then engaged in the business of a common carrier of passengers and merchandise for hire, and making regular trips to and from ports on Puget Sound, in Washington Territory, and the port of San Francisco, in the state of California.  Among other Puget Sound ports, at which she touched in her regular trips, was the port of Seattle.

The company had, during the times referred to, an agent on Puget Sound, residing at the port of Seattle, and named Otis Freeman.

The main cabin of the *City of Panama* is about 61 feet long, fore and aft; $11\frac{1}{4}$ feet wide, forward; 10 feet wide at the hatch, hereinafter mentioned, and $9\frac{1}{2}$ feet at the after end. State rooms are situated on either side of it—outside of these dimensions.

From the state rooms it is separated by lines of partition wall.  There is a little saloon or boudoir on the port side of the ship, aft the cabin.  A part of the after line of the cabin forms the forward line of the boudoir, and the boudoir is entered directly from the main cabin.  There are two principal dining tables about the center of the cabin, one about 18 and the other about 17 feet long.  They are disposed end to end.  There is a space between them about the center of the cabin, of nearly seven feet.  A settee extends along each side of each table.

The tables are about two feet ten inches in width, and the settees each one foot wide.  Each table, together with its settees, occupies a space of six feet in width.  A hatch in the cabin floor or deck, is located between the two tables.  It is six feet two inches by six feet three inches in surface, and is made up of four small hatches, each about three feet square, which may be taken up separately.

The time required to take up one of these small hatches is less than half a minute.  The hatches, when down, are flush

68

with the cabin floor, and are usually covered with matting. When down and covered there is nothing to indicate that they are there.

The distance from the ladies' boudoir to the hatch is 29 feet.   The distance from the hatch to the nearest ends of the tables, both fore and aft, is about four inches.

Directly underneath the hatch in the cabin deck, there is a corresponding hatch in a lower deck, opening down into the hold.   About five feet below this lower opening, a cylindrical iron casing, about two feet in diameter, the casing of the steamship shaft, is situated, running athwart ship under the centers of the hatches.   From the top surface of this casing to the surface of the cabin floor is about 14 feet.   With the vessel loaded as she was at the time of the accident, hereinafter mentioned, the distance from the surface of the cabin floor at the hatch, vertically downward through both hatches to the top of the load in the hold, was fifteen or twenty feet.

This descent through the hatches was, at the time of the accident, clear and unobstructed.   There is a passage way on either side of the long tables in the cabin between the settees and the lines of partition, which separate the cabin from the state-rooms.   The width of each passage way, half way between its extremities, is two feet—the width increases forward and diminishes aft.   From the starboard edge of the starboard settee at the aft table to the line of the state-rooms on the starboard side, is two feet, so that the passage way between the end of the settee and the state-rooms at that point, is two feet wide.   The port and starboard edges of the hatch are about on a line with the hatches of the port and starboard settees respectively, and the ends of the settees extend to within four inches of the hatch.   The state-rooms on either side of the cabin are numbered.   They are arranged along each side in pairs, and are entered through short alcoves, which branch off at right angles from the main cabin.   On the one side of an alcove is the door into one, on the other side the door into the adjoining state-room.

On the starboard side of the cabin are two state-rooms

numbered seven and eight, entered through one alcove.  This alcove is two feet two inches in width, and the forward side is on a line one and one-half inches aft of the after edge of the hatch.  This alcove is exactly opposite the forward part of the starboard settee at the after table.  A lighted lamp was, at the time of the accident, hanging over this table, seven or eight inches from the forward end of it, and in front of this alcove. There is a small table in the after part of the cabin.

On the afternoon and evening of the 18th day of January, 1876, and at the time of the occurrences on board the vessel, which are hereinafter narrated, she was lying in navigable tide water, at her wharf, in the port of Seattle, and about to sail for the port of San Francisco, and was there receiving on board her passengers, preparatory to that voyage.

On or before the 15th day of the same month, at Portland, in the State of Oregon, Mrs. Phelps, by her son-in-law, an agent in that behalf, Mr. James B. Montgomery purchased a ticket from Theodore Wygant, who was then, at Portland, the agent of respondents to sell the same, entitling her, upon the voyage above mentioned, to a first-class cabin passage on this steamship, from Seattle to San Francisco.  The ticket was a coupon ticket, purporting to grant passage between Portland and San Francisco, over the lines of three distinct transportation companies, namely: Over the steamboat line of the Oregon Steam Navigation Company, from Portland, Oregon, to Kalama, Washington Territory, over the railroad line of the Northern Pacific Railroad Company, from Kalama to Tacoma, Washington Territory, and over the steamship line of the Pacific Mail Steamship Company, on the *City of Panama*, from Tacoma to San Francisco.

Mrs. Phelps received the ticket from Mr. Montgomery, on the 15th day of January, 1876, and traveled upon the same, according to its tenor, by steamboat and railroad to Tacoma. From Tacoma she went to Seattle by steamboat, arriving there on the 17th; there, on that day, she found the steamship lying at her wharf, as above stated, and made the acquaintance of Mr. Freeman, the agent.  She ascertained from him, at that

time, that she should have a stateroom, and that the vessel would sail the next day. She remained at a hotel in Seattle, named the Occidental, until the evening of the next day, near sundown, when she went on board, as a passenger for the contemplated voyage. On the 17th and 18th there were at Seattle a number of persons, expecting to be passengers with her. Among these were certain cabin passengers, namely: General John Adair and wife, a Mrs. Clendennin, and a Mrs. Murray.

General Adair and wife had come to Seattle from Portland by the same route, and at the same time, as Mrs. Phelps, upon coupon tickets similar to hers, purchased at the same office in Portland. These named passengers all went aboard the steamship, for passage, at Seattle, on the evening of the 18th, and had staterooms assigned them. The stateroom numbered 7 was assigned General Adair and wife, and Mrs. Phelps; the one numbered 8 was assigned to Mrs. Clendennin and Mrs. Murray.

Mr. Freeman told Mrs. Phelps to go on board, and she went aboard with Mrs. Murray and Mrs. Clendennin, pursuant to his instructions. General Adair had previously selected the stateroom for Mrs. Phelps, and it was arranged that she was to occupy it jointly with himself and wife. She went aboard before General Adair and wife, and was shown to her stateroom, No. 7, by Mrs. Clendennin. From the time she went aboard until she received the injuries upon which suit is brought, she did not leave the ship, but remained in and about the cabin.

On arriving at her stateroom, Mrs. P. deposited there a carpetsack or satchel and other articles, which she brought aboard with her. Very soon afterwards she was summoned to supper by a servant of the vessel, and she took supper aboard with the Master, Mrs. Murray, Mr. Freeman and others. This was about 6 o'clock P. M. Shortly afterwards General Adair and his wife came aboard, and Mrs. Adair, Mrs. Phelps and the ladies occupying room No. 8, proceeded together to their state rooms. The General accompanied them as far as the alcove leading to the rooms. There the ladies arranged matters for

their voyage, and determined the berths they were severally to occupy, after which they all repaired to the ladies' boudoir. In passing to the boudoir, at this time, Mrs. Clendennin and Mrs. Murray went aft from the alcove, along the starboard passage-way, but General Adair and wife, and Mrs. Phelps, going from the alcove, directly between the two main dining tables and over the hatch, which was then covered, and concealed by a piece of matting, walked aft on the port side. None of them had any knowledge of the existence of the hatch, nor did they have till the occurrence of the accident hereinafter mentioned. Mrs. Phelps had previously passed over it in going to her room. There was nothing there to indicate its existence.

On reaching the little saloon the party seated themselves. There was then, perhaps, another lady sitting there with them, and ten or fifteen other passengers were in and about the cabin. The officers and crew were busy getting ready for sea, and, as the agent says in his testimony, they were "in a tremendous hurry." The main cabin was lighted as ordinarily, with sperm-oil clock lamps, hanging at intervals along the center and over the tables. Passengers and the ship's servants were moving about the cabin.

The party had been seated but a moment in the boudoir, when Mrs. Phelps remembered she had left a mitten in her stateroom, which she desired to use in connection with the mate to it; which she was knitting. She immediately went to procure it, retracing the same route by which she had just come to the boudoir, she regained her room. She there got her satchel, opened it, picked out the article she sought, reclosed and replaced the satchel, and, remaining no longer than necessary to complete these operations, left the stateroom, with knitting work and spectacles in hand, to rejoin her companions in the boudoir. Meantime, while she was thus occupied in her room, the third officer of the ship, named Rider, came to the hatch, removed one-fourth of it, that is, the small aft starboard hatch, and went below through the opening to close the ports. A cabin boy, named Driscoll, aged twenty-odd years, who was then sweeping the cabin, was put in charge of the open hatch.

Coming now out of her stateroom and out of the alcove, Mrs. Phelps essayed to pass between the tables as she had repeatedly done before. No one warned her of her danger. Driscoll attempted to stop her but not until it was too late. She fell into the open hatch, and down through the lower hatch into the hold, a total distance of 15 or 20 feet, striking upon a pile of hoop-poles which lay as part of the vessel's cargo, under the hatches. She was found immediately after, lying on the hoop-poles in the hold, near the iron casing of the shaft, in great anguish and unable to rise.

She was very severely injured by the fall. Her system received a severe shock. She was hurt much internally, particularly in and about her spleen, stomach and liver. She was badly bruised on her back, right-side and shoulder; broke her right-arm about half way between the elbow and shoulder, and sustained in addition, a compound comminuted fracture of the right-elbow joint, the shattered bones being crushed into a dozen or more pieces and protuding through her dress. She was, very soon after the accident, raised to the cabin deck, through the hatches, by aid of a block and tackle, and laid in her stateroom. Here she was attended by a surgeon, Dr. George V. Calhoun, and soon after was conveyed ashore by his directions. None of the passengers witnessed the accident. The following named persons called as witnesses in this case, by the defense, claimed to have been present in the cabin at the time: The steward and stewardess of the ship, and Driscoll and three others, McCausland, Johns and Livingstone; the last two appear to have been aboard from motives of curiosity, and without any particular business to call them there. We do not find that any of these six, but Driscoll, actually saw Mrs. Phelps fall into the hatch. Another witness, Captain Wright, says he was in the cabin a few minutes before the accident and thinks he saw Mrs. Phelps cross the cabin towards her room. Mr. Freeman was in the purser's room at the time and did not see the disaster. He superintended raising her to the deck again.

After Mrs. Phelps went ashore, the vessel departed on her

voyage taking General Adair and wife, Mrs. Clendennin and Mrs. Murray, as passengers.   Gen. Adair and wife made the voyage to San Francisco upon the same tickets that he had purchased, as before mentioned, in Portland.

Mrs. Phelps suffered intensely from her injuries.   Three surgeons attended her.   Dr. Calhoun as principal, and Drs. Miner and Baker for consultation and assistance, the first two of whom have testified.   On the evening of the casualty, Drs. Calhoun and Baker examined her and dressed her wounds.   It was found necessary to put her under the influence of chloroform, in order to make the preliminary examination.   But little chloroform was administered.   She was seized with distressing and incessant vomiting immediately upon recovering from the anæsthetic.   The vomiting continued for several days, and after that recurred occasionally for many weeks.   She was troubled with severe internal pains and pains in her back, right-side and shoulder.   The side, back and shoulder were found extensively contused.   Her crushed elbow caused her exceedingly severe pain for several weeks.   All these lesions and pains are referrible to her fall, as their natural and proximate cause.

For six weeks she was by reason of her disordered condition, confined to her room at Seattle.

She had recovered from her external bruises at the time of the trial in the District court.   The flesh wound at the elbow had then healed and the broken bone above, the elbow had reunited.   Her other injuries are, in their nature, permanent through life.   By them her liver and stomach are rendered more susceptible to disease.   At the time of the trial in the District court, she had no use of her right arm.   Her elbow joint could not be moved to any extent without very great pain. She has some motion of her right fingers.   She never will have the use of the arm.   The arm and elbow are not at present as serviceable as a false arm would be.   She has to carry the arm continually in a sling, day and night, and will be obliged to carry it so through life.

Such are the facts.   In regard to them we coincide with the judge who tried the case in the District court.   We agrée

with him, both in his sifting of the testimony and in his conclusions. As to some particulars, the evidence being such as it is, we defer to his opinion rendered below. He had the witnesses personally before him, and was better able then we to judge of their credibility. We feel that "to warrant a reversal upon a mere question of fact, the preponderance of evidence should be of a somewhat decided character, such as would justify the granting of a new trial in a court of common law, on the ground that the verdict was against the weight of evidence." (*The Grafton*, 1 Blatchf., 171, 178). No such preponderance is manifest here.

The eighth question must be answered upon the law and the facts. What these are we have already stated. Are libellants, upon them, entitled to recover? From what we hold to be the law, and find to be the facts, the conclusion follows irresistibly it seems to us, that they should have a decree.

There can be no question, upon the evidence, but that Mrs. Phelps was aboard in the capacity of a passenger, to be carried for hire. A contract to that effect existed between her and the owners of the ship. That contract she had fully executed on her part. She was fairly on board for her passage, and the liability of the carrier for her safe carriage and delivery had begun.

Such being her situation, the carrier was bound to secure her a safe passage, so far as that could be done. He was under obligation to have, at his command and in his exercise, all the means necessary for insuring her safety, that a very prudent and considerate man of intelligence, equal to the undertaking of such a charge, could reasonably have informed and possessed himself of and used. Shear. and Red. on Neg., Section 266 and cases cited; 1 Parsons, Sh. & Adm., 644 and note.

Making the transportation of passengers by sea a business, it was his duty to be peculiarly conversant with the dangers that beset them aboard his vessel, and to anticipate and thoroughly provide against the possibilities of accident. This hatchway in mid-cabin habitually concealed at a point inviting passengers to cross, and at a point where they are customarily permitted to

cross, it was a remarkably patent source of peril; it was a pitfall, admirably calculated to catch men.

It is impossible for us to believe that any injury would have befallen Mrs. Phelps had the dangerous character of this hatchway been properly appreciated by those having charge of the steamship. The defendants contend, however, that at least this is a case in which the evidence shows contributory negligence.

We do not so find. Mrs. Phelps appears not to have known the hatch was uncovered; she did not know it was there.

We fail to find that any warning was given her at all. But admit that there was, she was then within two feet—a single step of the opening. The warning then came too late— too late, most certainly, for an elderly person. If warning was given in the language testified to by respondent's witnesses, it was inadequately expressed, because couched in seamen's phrase, and not calculated to arouse a landsman's mind, at once, to a full sense of what was said. Mrs. Phelps may or may not have been familiar enough with the word "hatch" to grasp at a flash its full import. But, passengers who are not sea-faring in habits, are not to be assumed very familiar with the technical names of different parts of a ship. A warning should bear relation to the person to be warned.

The negligence seems to have been all on the defendants', side, and their negligence was gross. It was easy to have foreseen just such a mishap as this. It was easy to have rendered such a mishap impossible. To have barricaded the passage-way between the tables, to have interposed a living person between any passenger and danger, or to have covered again the hatch the instant the third officer had descended; any one of these was a most simple measure, a most effectual safe-guard, and a device ready to occur to any intellect above that of a fool.

Under the circumstances the libellants were bound to prevent the accident, and, having failed to prevent it, are bound to answer for it.

Lastly, what should be the amount of the decree remains
69

to be determined. This is a question of the measure and quantity of damages.

Upon this point both parties appeal. The libellant's proceedings for taking his appeal are, perhaps, to some extent, irregular, but that they amount to an appeal, is admitted. Resp. Brief, p. 26.

The judge below awarded $5,000 damages. This finding we would not venture to disturb, were we not unanimously convinced that the amount is much too small. In arriving at his estimate, the judge of the district court omitted some considerations which, we are all of the opinion, should go to swell the decree.

This is not a question of what worth one's life or one's limb might be to somebody else, but of what it is to one's self. Any comparison, therefore, between an amount of damages, given by statute, to wife and heirs, on the loss of husband or protector, as is made in a case cited by respondents, is beside this case.

Nor can we follow those judges who hold, that loss or dimunition of ability to earn a livelihood should be left out of account, in the case of injury to a married woman.

Because a husband is able to provide for her to-day, does not insure her against the death or disability of her husband to-morrow. We are not in favor of providing damages to meet prospective losses that may never happen. But we regard the physical ability of the wife to support herself as being a separate estate and inalienable possession, which, indeed, she may never need to draw upon; but is, nevertheless, hers, ready for any exigency. In this case, the loss of ability is but partial; a right arm, however, to an elderly lady, is proportionately more valuable than to a younger, for she will not be presumed able to acquire, with equal perfection, facility in the use of the left. We estimate Mrs. Phelps' loss, in mere physical ability to earn support, as two-thirds of what she previously possessed. Her loss is wholly physical. The accident has fastened upon her, for life, an inconvenience and a disfigurement. She has, as long as she lives, to nurse and protect a useless, or nearly useless limb.

The unusual and prominent manner, in which she will be obliged to carry it, will necessarily attract attention and remark, and subject her to considerable annoyance.

In both these particulars she is entitled to compensation.

But her greatest injury, for which she seeks to recover, is the physical pain to which she has been subjected. She claims nothing for mental suffering. Had she received only the fracture above the elbow and the bruises, her case would have been very different from what it is. But in addition to that there was a compound comminuted fracture of the elbow joint, and the internal lesion. It is familiar knowledge that injuries to the joints are pre-eminently painful. In this case the injury to the joint was exceptionably severe—the bones were crushed; her physical sufferings were, in the opinion of the surgeons intense and excruciating; though greatly lessened, they are likely to endure for an indefinite period, perhaps through life.

Of course it is impossible to weigh this long continued agony by dollars and cents, but we must do the best that we can towards compensation.

We think the suffering ought not to be computed at less than ten thousand dollars. Against her inconvenience and disfigurement we place two thousand dollars.

Reckoning the probable duration of her life at about thirteen years, and the yearly value to her of her mere physical ability to earn her own livelihood by the labor of her hands, at $500, we give her, for the loss of her ability, the sum of three thousand dollars.

Let a decree be entered, in favor of libellants, for the aggregate of $15,000.